IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT _ANCHORAGE_

In the Matter of the Application
for Post Conviction Relief Of:

)
)
)
)
)
)
)
)
)

_LOUIS D. HASTINGS_

(Name of Applicant)

**FOR COURT USE ONLY**

CASE NO. _96-4823_   CI
_T/W 3AN 83-1300 cr_

APPLICATION FOR POST CONVICTION
RELIEF (CRIMINAL RULE 35.1)

## CERTIFICATION

I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any offense unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

I, _Louis D. Hastings_, hereby apply for relief under Criminal Rule 35.1.

## PART A

(Please type or print neatly. Also, if possible, please attach a copy of your judgment of conviction.)

The conviction (sentence) from which I seek relief is as follows:

1.  Full original case number: _3ANS-83-1300cR_

    Case name: _STATE OF ALASKA_ _LOUIS D. HASTINGS_
    (plaintiff)                      (defendant)

2.  Court which imposed sentence: ☐ District Court   ☒ Superior Court
    Location: _Anchorage_

3.  Date shown in clerk's certificate of distribution on the judgment: _Entered 8/14/84_

4.  Date of sentencing and terms of sentence: _July 27, 1984_
    _99 years on each of 6 counts of 1st degree murder;_
    _20 years on each of 2 counts of attempted 1st degree_
    _Murder; all sentences were run consecutively._

5.  Crime or crimes of which I was convicted: _Six counts first degree_
    _murder; two counts attempted murder._

**000001**

Page 1 of 7
CR-610 (2/94)(cs)
APPLICATION FOR POST CONVICTION RELIEF
CRIMINAL RULE 35.1

**000978**

Crim. Rule 35.1

Order on Remand, J. Bolger, Nov. 27, 2002 (vacating previous orders allowing discovery to proceed) . . . . . . . . . . . . . . . 208

Order, J. Bolger, Dec. 17, 2002
(Permitting a 35.1(f)(1) response) . . . . . . . . . . . . 209

Opposition to "State's [Fourth] Motion to Dismiss for Failure to Set Out a Prima Facie Case for Post-Conviction Relief,"
Jan. 21, 2003 . . . . . . . . . . . . . . . . . . . . . . 210-345

Supplemental Evidence in Support of Application for Post Conviction Relief and Memorandum in Support of Renewed Motion to Withdraw Plea, Jan. 21, 2003 . . . . . . . . . . . . . . . . . . 346-356

Order Granting Motion to Dismiss, J. Bolger,
Apr. 4, 2003 . . . . . . . . . . . . . . . . . . . . . . 357-361

Motion for Reconsideration of Order on Remand,
Apr. 21, 2003 . . . . . . . . . . . . . . . . . . . . . . 362-367

ii

6. I am now ☐ not in custody ☒ in custody at _Leavenworth Penitentiary_

7. Mailing address: _Louis D. Hastings, #80544-011. P.O. Box 1000, Leavenworth, KS 66048_

8. The finding of guilty was made after a plea of

   ☐ guilty      ☐ not guilty      ☒ nolo contendere

9. Finding was made by      ☐ a jury      ☒ a judge

10. Name of judge who pronounced sentence: _Hon. Ralph Moody_

11. Name and address of my lawyer: _John B. Salemi; 900 W 5th Ave. Suite 200; Anchorage, Alaska 99501_

    ☐ I was not represented by a lawyer.

12. Lawyer was ☐ employed by me      ☒ appointed by the court

13. Did you appeal your conviction (or sentence)? _yes_

14. If you answered "yes" to question No. 13 above, state the following:

    a. the name of each court to which you appealed:

       _Court of Appeals - State of Alaska_

    b. the result in each court to which you appealed and the date of such result:

       _Judgment affirmed; Case No. A-602; date unk._

    c. Did a lawyer represent you on the appeal(s)? _yes_

       State the name(s) and address(es) of your lawyer(s) on the appeal(s):

       _Pamela Cravez; Assistant Public Defender; 900 W. 5th, Suite 525, Anchorage AK_

       Lawyer was: ☐ employed by you      ☒ appointed by the court

15. Did you seek any further review of or relief from your conviction or the sentence imposed in this or in any other court by way of a previous application for relief or correction of sentence under Alaska Criminal Rule 35.1, or by way of a petition for habeas corpus or coram nobis, motion, application or any other remedy (including any petition in a federal court)? _See explanation_

Page 2 of 7
CR-610 (2/94)(cs)
APPLICATION FOR POST CONVICTION RELIEF
CRIMINAL RULE 35.1

000002

000979

Crim. Rule 35.1

Hastings v. Luna
Case No. 3:06-cv-0037-TMB          Attachment to Supplement to
Petition for Writ of Habeas Corpus          Page 3 of 64

16. If you answered "yes" to No. 15, state the following:

 a. each ground for such relief which has been previously presented:

A Motion was previously filed to withdraw
guilty plea; the grounds raised were that
the accused was denied the effective assistance
of counsel.

 b. the proceedings in which each ground was raised:

Motion to Withdraw Plea in Case No.
3ANS-83-1300CR

 c. the results of each of these proceedings and the date of such results:

The matter was not finally resolved.

 d. State name and address of lawyers(s), if any, who represented you in these proceedings
 (separately for each proceeding) David Grashin; 3900 Arctic Blvd.
Suite 201, Anchorage, AK

 e. Was your lawyer employed by you or appointed by the court? appointed

Page 3 of 7
CR-610 (2/94)(cs)
APPLICATION FOR POST CONVICTION RELIEF
CRIMINAL RULE 35.1

Crim. Rule 35.1

000003

000980

Hastings v. Luna
Case No. 3:06-cv-0037-TMB                Attachment to Supplement to
                                         Petition for Writ of Habeas Corpus          Page 4 of 64

f.  If you did not raise the present grounds for relief (see Part B of this application for post conviction relief) in any previous application you made, state your reasons for not raising the present grounds in your previous application for post conviction relief.

_____

_____

_____

_____

_____

_____

_____

## PART B

I believe I have grounds for relief from the conviction and sentence described in Part A. (You must attach all affidavits, records or other evidence supporting your allegations or state why they are not attached.)

1.  My grounds for relief are as follows: (List them as concisely and clearly as possible) _____

The plea is defective because I was denied the effective assistance of counsel because my attorney failed to correctly advise me of the results and progress of investigation into a heavy-metal-induced-psychosis-based defense, instead falsely leading me to believe that this line of inquiry was completely hopeless, and such failure on the part of counsel caused me to enter pleas of no contest. The attached memorandum and attachments are incorporated by reference.

2.  The facts which support each of the grounds set out above are: (List in the same order as set out in paragraph 1.) The attached memorandum and attachments are incorporated by reference.

_____

Page 4 of 7
CR-610 (2/94)(cs)
APPLICATION FOR POST CONVICTION RELIEF
CRIMINAL RULE 35.1

000981

000004

Crim. Rule 35.1

Hastings v. Luna
Case No. 3:06-cv-0037-TMB          Attachment to Supplement to
Petition for Writ of Habeas Corpus          Page 5 of 64

3. I have personal knowledge of the following facts among those listed in paragraph 2: (False statements with regard to facts stated upon your personal knowledge are subject to the penalties for perjury.)

My attached affidavit is incorporated by reference.

4. What evidence, other than your own statements, do you have to prove the facts you stated in paragraph 2 above?

The attached memorandum and affidavits are incorporated by reference.

Page 5 of 7
CR-610 (2/94)(cs)
APPLICATION FOR POST CONVICTION RELIEF
CRIMINAL RULE 35.1

000005

000982

Crim. Rule 35.1

Hastings v. Luna
Case No. 3:06-cv-0037-TMB        Attachment to Supplement to        Page 6 of 64
                                 Petition for Writ of Habeas Corpus

_____

_____

_____

## PART C

(Fill out this section only if you claim that you are indigent. You
must attach a sworn Financial Statement on form CR-206.)

☐    I hereby apply to have the filing fee and other costs waived for this application.

☐    I request that the court appoint an attorney to represent me in this proceeding because I
cannot afford to pay for one. I understand that:

1. I must provide to the court all financial information requested by the court so the court
   can decide if I qualify for an appointed attorney. This information may be made
   available to the Attorney General after the conclusion of this proceeding. If I give false
   information, it may be used to prosecute me for perjury.

2. If my financial situation changes and I do not report this to the court, the law requires
   my appointed attorney to do so.

3. If my application for post conviction relief is denied, the court will enter a judgment
   against me which will require me to pay part of the cost of my appointed attorney.* In
   most cases the court will use the schedule shown below to determine the amount I will
   be required to pay. However, in unusual circumstances, the court may enter judgment
   against me for more or less than the scheduled amount. After the judgment is entered, I
   may request the court to reduce the amount of the judgment if payment would cause
   manifest hardship to me or my family.

### Schedule of Costs For Court-Appointed Counsel

| Offense of Which Applicant Was Convicted | | | |
|---|---|---|---|
| Misdemeanor | Class B or C Felony | Class A or Unclassified Felony | Murder in the 1st or 2nd Degree |
| $250 | $250 | $500 | $750 |

### GENERAL WAIVER

I authorize anyone to release to the Alaska Court System all information concerning my assets,
liabilities, account balances and any income source I have had for the past three years. This
includes but is not limited to all current and past employers, banks, credit and depository
institutions, accountants, brokers and credit bureaus.

_____

\*   Pamphlet CR-204 explaining the benefits and costs of court-appointed counsel is available
from the court.

Page 6 of 7
CR-610 (2/94)(cs)
APPLICATION FOR POST CONVICTION RELIEF    000983
CRIMINAL RULE 35.1

**000006**

Crim. Rule 35.1 & 39
Admin Rule 12(e)(1)

VERIFICATION

I, _Louis D. Hastings_____, say on oath or affirm that I have read all parts of the foregoing document and believe all statements made in the document are true. I understand that false statements in this application may subject me to prosecution for perjury.

_____6/27/96_____          _____
            Date                        Signature of Applicant

                               P.O. Box 1000
                               _____
                                        Address
                               Leavenworth, KS    66048

Subscribed and sworn to or affirmed before me at _Leavenworth_____, _Kansas_
on __6/27/96__
       (date)

(SEAL)    **AUTHORIZED BY THE ACT OF**
          **JULY 7, 1955, AS AMENDED, TO**       _____
          **ADMINISTER OATHS (18 USC, 4004)**    Clerk of Court, Notary Public, or other
                                                 person authorized to administer oaths.
                                                 My commission expires: _____

I certify that on _June 28, 1996__,
a copy of this application was sent to the District
Attorney at _Anchorage_____, Alaska.

Clerk: _____

I certify that on 8/16/96
a copy of the above was mailed to each
of the following at their addresses of
record. Harley, PA
M. L. Borneman
        Deputy Clerk

Page 7 of 7.
CR-610 (2/94)(cs)                    000984
APPLICATION FOR POST CONVICTION RELIEF
CRIMINAL RULE 35.1

000007

Crim. Rule 35.1

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT

STATE OF ALASKA,
        Plaintiff,

vs.                              Case No. 3ANS-83-1300 CR

LOUIS D. HASTINGS,
        Defendant.

## MEMORANDUM IN SUPPORT OF RENEWED MOTION TO WITHDRAW PLEA

### Issue

**Issue: Mr. Hastings was denied the effective assistance of counsel because his attorney failed to fully and correctly advise him of the results and progress of investigation into a heavy-metal-induced-psychosis defense, instead falsely leading him to believe that this line of inquiry was completely hopeless, and such failure on the part of counsel caused Mr. Hastings to enter his pleas of no contest.**

### Preliminary Statement

This matter is brought pursuant to Alaska Rule of Court 35.1. The convictions of Louis Hastings in question here are in violation of the State and Federal Constitutional guarantees of due process and effective assistance of counsel in felony matters. There are material facts not previously presented and heard that require vacation of the conviction and sentence in the interest of justice. The only evidence that has been put in the record thus far on the issue of the validity of the pleas of no contest is the testimony of Mr. Hastings' counsel, John Salemi, who previously testified at a partial and invalid hearing on Motion to withdraw pleas. He has testified as to his reasoning for the actions he took in representing Mr. Hastings on direct examination, but has not been cross-examined, as the matter went up on appeal and was remanded so that the proceedings would take place before a new judge. Nor have Mr. Hastings and at least two other key witnesses -- Alex Schauss and Dr. Robert Thatcher -- testified in support of the Motion to

1 Hastings v. Alaska -- Memo

000985
000008

Hastings v. Luna
Case No. 3:06-cv-0037-TMB
    Attachment to Supplement to
Petition for Writ of Habeas Corpus
    Page 9 of 64

Withdraw plea. Affidavits of Mr. Hastings, Mr. Schauss and Dr. Thatcher are attached hereto and incorporated by reference.

Statement of Facts

The Plea Hearing

     ON DECEMBER 5, 1983, Louis Hastings pled no contest to every charge he faced: six counts of first degree murder and two counts of attempted murder (Tr. Dec. 5, 1983, p. 426). There was no agreement on the part of the prosecution to recommend any type of reduced or concurrent sentence on any count (Tr. Dec. 5, 1983, p. 429). Mr. Hastings received nothing in exchange for his pleas. As the prosecutor noted: "It is not a negotiated plea, no promises or concessions whatsoever have been made to the defendant. I found out that we would be proceeding in this manner for certain, yesterday at about 10:00 in the morning....There has been no agreement with respect to the sentence" (Tr. Dec. 5, 1983). Before Mr. Hastings entered the pleas, the Court advised Mr. Hastings that on each of the first degree murder counts, he faced from 20 to 99 years. Although his attorney believed that the presumptive sentence on the attempted murder counts would be 5 years, the Assistant District Attorney corrected him, advising that the presumptive sentence would be 7 years (Tr. Dec. 5, 1983, p. 431).

     During the Court's personal inquiry of Mr. Hastings, the following was stated:

     THE COURT: Is it your proposal to enter a plea of no contest in this matter because you--after discussing this with your attorney because you believe that's the best way to resolve this case.

     MR. SALEMI: Your Honor, unless the court feels compelled to ask that question, I would advise my client not to answer it. It seems somewhat ambiguous, the best way to resolve it (Tr. Dec. 5, p. 431).

     The Court, accommodating Mr. Salemi, then simply asked Mr. Hastings if it was his "desire to proceed in this manner" (Tr. Dec. 5, p 431). After Mr. Hastings had replied "No contest," in response to the Court's inquiry as to how he pled made after presentation of each count to him, the prosecutor asserted in addition to those comments

000009

2  Hastings v. Alaska -- Memo

000986

about sentencing cited above: "In fact Mr. Hastings should be aware that due to the -- to what I believe to be deliberate cruelty shown to these victims, the suffering they endured, the extensive planning that went into these crimes and basically just the sheer enormity of these crimes, that the state will be asking the court to impose a period of jail time which will approach the upper limits of what is permissible. He should know that now." (Tr. Dec. 5, 1983, p. 442). At a subsequent, partial hearing on Motion to Withdraw Plea, Mr. Salemi testified that he believed that Louis Hastings' desire to spare his family the trauma of being involved in the case was one of the reasons that he pled no contest and sought a closed guilty but mentally ill hearing (Transcript of Hearing on Motion to Withdraw Plea, March 6, 1985, 338).

When it came time for the factual basis to be given, the prosecutor began relating information about Mr. Hastings' loss of memory, his suicidal ideations, his deteriorating health in general after his move to Alaska, and his psychosis. As the prosecutor began to relate Mr. Hastings' delusion about the trans-Alaska pipeline embodying evil and figuring prominently in his psychotic suicide scheme, his lawyer again interrupted the proceedings, asking to go off the record so that he could have a discussion with the prosecutor. His request was granted. After the discussion, the prosecutor avoided all discussion of Mr. Hastings' unusual mental processes (Tr. Dec. 5, 1983, p. 443).

Mr. Hastings' plan, which was described as irrational, psychotic, and bizarre by a leading psychiatrist, as noted below in this Memorandum, was described as follows:

His idea was to commit suicide in such a way that his family would not be aware what had happened to him. As he thought it out, he and all the residents of McCarthy would simply disappear. His plan involved killing all the people in McCarthy, hijacking the mail plane, flying the mail plane himself to a remote area where he could drop off the bodies, landing the mail plane near Glennallen and setting the controls so the plane would take off by itself and eventually crash. He believed he could do this -- do all this even though he had never soloed in an airplane. After that his idea was that he would hijack a gasoline tanker truck, drive it into pump station 12 of the Alaska Pipeline, puncture the tank with some bullet holes and ignite the gasoline, immolating himself and the driver and destroying the pump station. As a result he felt the oil in the entire

3  Hastings v. Alaska -- Memo                          **000010**

**000987**

pipeline would congeal and the pipeline would never be able to be cleaned up and used again in the future.  The premise for this plan was the idea that the pipeline had contributed to the development of Alaska in a way that brought too many people into the state which he felt was bad.... (Tr. Motion to Withdraw Plea Hearing pp. 350-51).

At the plea hearing there was a bit of discussion about whether Mr. Salemi had

discussed mental defenses with Mr. Hastings.  Mr. Salemi advised the Court that he had...

discussed the defense of diminished capacity with Mr. Hastings (Tr. Dec. 5, 1983).  The

Court inquired of Mr. Hastings as follows:

> THE COURT:  All right. One other thing before I get into that.  You--have you and your attorney considered and discussed the possibility of psychiatric defenses?
> MR. HASTINGS:  Yes.  (Tr. Dec. 5, 1983, p. 438).

Additionally, the prosecutor displayed some concern for the issue of mental-state

defenses:

> MR. BRANCHFLOWER:  ....for the record I would like to touch upon.  I would ask Your Honor to inquire of the defendant that even--whether he understands that even though he has raised the issue of insanity, that there is a separate issue that could be raised at trial and that is this issue, whether because of some mental disease or defect he lacked the culpable mental state necessary for the crime of murder in the first degree.  Now--that is that on the basis of a mental disease or defect it could be alleged that the defendant--I should say it could be challenged that the defendant knowingly fired the shots at people from his weapon.  For instance he could have challenged that he had no intent to kill any human being.  Now both of these things are elements of the crime of first degree murder.  In a trial the prosecution would have to prove these things beyond a reasonable doubt.  And even though it's true that he might bear the burden of proving the defense of insanity, this is a little bit different matter.  For instance if he questioned either of these 2 elements at trial, either that he did not knowingly fire the shots or that he did not intend to kill anyone, based on some mental disease or defect, that the state would have to prove those 2 things beyond a reasonable doubt before he could be convicted of first degree murder.  And that if he successfully raised a reasonable doubt about either of those 2 elements based upon his mental condition, that he would be found not guilty by reason of diminished capacity.  And I would ask that Your Honor address that.  I think his counsel has explained that to him.
> THE COURT:  Well, let me ask....
> MR. BRANCHFLOWER:  What in essence he would be entitled to would be a verdict of not guilty by reason of diminished capacity and he would be committed as if he had been found insane.
> THE COURT:  Well, that was included in my question as to whether the attorney had considered and discussed psychiatric defenses and you indicated you had, Mr. Salemi, and you've indica--you've heard the district attorney raise the question I think in

4  Hastings v. Alaska -- Memo

000011

000988

Hastings v. Luna
Case No. 3:06-cv-0037-TMB                   Attachment to Supplement to
                                            Petition for Writ of Habeas Corpus                   Page 12 of 64

just different words. Is that your conclusion also and that you have discussed this with him?

MR. SALEMI: Yes, Your Honor. (Tr. Dec. 5, 1983, pp. 456-57).

Metal toxicity and Mental Defenses

During the summer of 1982, Mr. Hastings was exposed to significant amounts of copper napthalate. During the following winter, he was exposed to a significant amount of lead paint dust. Additionally, he had started drinking spring or stream water in Kennicott (primarily spring water), at the site of the extensive copper mining operation, in the summer of 1982 and continuing up until the time of the homicides. He had also previously been exposed to new copper pipes in an area with soft water (Affidavit of Louis Hastings pp 1-2). The Affidavit of Louis Hastings is attached hereto and incorporated by reference.

Mr. Salemi had a laboratory analysis done on Mr. Hastings' blood and hair samples. The hair samples showed abnormally high levels of copper and showed depressed lithium levels, which suggest the presence of toxicity. Mr. Salemi advised Mr. Hastings of this and gave him copies of the laboratory documents so showing. Mr. Hastings had been made aware of the relationship between high levels of copper and violent behavior. His attorney advised him that if this theory were developed, it could form the basis for a defense. As a result, Mr. Hastings and Mr. Salemi agreed that this theory should be further investigated. Mr. Salemi also advised Mr. Hastings that this theory could be the basis for a Guilty but Mentally Ill hearing. As a result Mr. Salemi and his client also agreed to investigate the theory for this purpose, as far as Mr. Hastings could tell (Affidavit of Louis Hastings p.2).

As the trial date approached, Mr. Hastings asked his attorney to seek a continuance so that the toxicity evidence could be pursued in support of a defense. Mr. Salemi indicated to Mr. Hastings that he had not received any response from the experts who had been contacted that was positive enough to merit the request for continuance. Mr. Hastings had had no direct contact with any expert. The only documents that he had

5  Hastings v. Alaska -- Memo

000989          **000012**

seen were the lab test documents showing chemical levels. He saw nothing interpreting those chemical tests. Given the negative report from his lawyer and his fruitless request of his lawyer to seek a continuance, Mr. Hastings pled no contest to all charges with no consideration whatsoever for having done so (Affidavit of Louis Hastings p. 3).

Mr. Hastings pled no contest to the charges on December 5, 1983. On December 12, 1983, the Public Defender Agency in Anchorage stamped "Received" on a letter from Dr. Robert Thatcher of the University of Maryland School of Medicine. The letter was dated December 2, 1983, and referred to prior conversation between Dr. Thatcher and a Mr. Grant Callow, who was Mr. Salemi's assistant (Exhibit A to Affidavit of Louis Hastings). That letter indicated the following: a. elevated copper levels could be a sign that Mr. Hastings suffered from copper toxicity at the time of the homicides; b. a behavior disorder similar to a psychosis could have been caused by this toxicity; because the pubic hair samples of Mr. Hastings were taken 6 months after the homicides, the copper levels indicated might have been even higher at the time of the homicides. None of these specifics was conveyed to Mr. Hastings before he entered his pleas (Affidavit of Louis Hastings p. 3). The Thatcher letter makes it clear that the following question needed to be answered: Was there a scientific method available for extrapolating the copper level present at the time of the homicides, based upon the elevated copper level at the time of the tests, particularly given the controlled conditions under which Mr. Hastings had been held since his arrest on the day of the shootings. Mr. Hastings sought the answer to this question himself before the guilty but mentally ill hearing, having been provided with Dr. Thatcher's letter after his pleas were entered. Mr. Hastings, desperate to have the matter investigated, wrote a letter for Mr. Salemi to send to Dr. Thatcher. This letter was dated May 30, 1984, bore Mr. Salemi's signature, and asked the following questions: "Could these exposures [those reported by Mr. Hastings to copper napthalate and lead paint] account for the elevated levels of copper you found in Hastings' pubic hair samples? Assuming no subsequent exposure, can you extrapolate a probable level of

6  Hastings v. Alaska -- Memo

000990

intoxication on March 1, 1983, from the level you found on ?? November, 1983? Finally, is there any synergism between copper and lead that would produce psychosis at levels not usually considered toxic?" (Attachment B to Affidavit of Louis Hastings). Even the double question mark signifying the unknown date was typed verbatim the way Mr. Hastings himself had placed it in the draft he had created for his attorney.

Mr. Hastings' attorneys had also contacted Alexander Schauss, an expert in the field, to scientifically investigate the copper toxicity issue. Mr. Hastings was not informed of what work had been done, what findings had been made, or what further work was suggested by Alexander Schauss. He was not fully advised of Schauss' involvement. According to information made available to Mr. Hastings' present counsel by Alexander Schauss, the following information was available from Schauss, but never made known to Mr. Hastings:

1. Schauss was to analyze Mr. Hastings' behavior prior to arrest and various samples from Mr. Hastings' anatomy. If findings were significant, then he was discuss them with various other specialized experts, write up a preliminary report, and send it to the public defenders, who would then take the further steps necessary to put the materials together for a defense if they felt there was sufficient cause to proceed.

2. Schauss, unbeknownst to Mr. Hastings, had done the following:

a. Noted an elevated copper level in Mr. Hastings' beard hair.

b. Published an article on the link between elevated copper levels and aggression two years earlier.

c. Contacted Dr. Carl Pfeiffer, Director of the Bio-Brain Research Center in Princeton, who recommended additional tests, and who was then the foremost authority on the subject.

d. Noted possible frontal lobe dysfunction in Mr. Hastings and contacted Dr. Anneliese A. Pontius, M.D., at Harvard University School of Medicine, who expressed a willingness to testify contingent upon additional testing.

7 Hastings v. Alaska -- Memo

**000014**

**000991**

e.  Contacted Dr. William Walsh, Ph.D. at the Argonne National Laboratory, who offered assistance, including agreement to assist regarding scientific determination of the significance of depressed lithium level found in Mr. Hastings.

f.  Contacted Dr. Maurice Bowerman, M.D., in Portland Oregon, a psychiatrist and former medical director of the Oregon Department of Corrections with expertise in disorders of mineral metabolism, enzyme disturbances and anti-social behavior.

g.  Contacted Dr. Herbert Kaye, who agreed to conduct the necessary neurophysiological studies at his laboratory at the State University of New York or at a West Coast university facility.

h.  Planned to attempt to scientifically recreate Mr. Hastings' metabolic status at the time of the homicides.

i.  Believed that further work and investigation was warranted.

(See Affidavit of Louis Hastings, pp 4-6; Affidavit of Alexander Schauss, attached and incorporated by reference).

Had Mr. Hastings known about the details of Thatcher's letter or the outline of what Schauss was doing and had the potential for doing, he would not have pled no contest (Affidavit of Louis Hastings).

Guilty but Mentally Ill Hearing

On July 25, 1984, the Court conducted a hearing to determine whether Mr. Hastings should be found guilty but mentally ill.  Dr. Joseph Satten, senior attending physician at Mount Sinai Hospital, president of the Northern California Chapter of the American Academy of Psychiatry and Law, and a professor at the Presbyterian Medical Center in San Francisco at the time, testified that Mr. Hastings was suffering from a major depressive episode "with psychotic features," among other things at the time of the shootings in question (Tr. July 25, hearing, pp. 532, 577).  Dr. Satten concluded that "because of his mental and emotional disturbance at the time of the crime, he was unable

8  Hastings v. Alaska -- Memo

000015

000992

to appreciate the wrongfulness of his conduct at that time" (Tr. July 25, 1983, p. 580).

Dr. Satten characterized Mr. Hastings' plan as "crazy," "essentially irrational," a scheme not derived of a rational mind about which the Doctor "didn't feel it was a plan that could work." (Tr. July 25, 1983, pp. 556-558, 579). The Doctor noted:

> ...There was a decreased ability to think and concentrate, and most important, there was a preoccupation with suicide that gradually began to dominate his entire thinking. His behavior--he became preoccupied with this crazy plan to save the state of Alaska and in this plan which in my opinion was irrational, megalomanic, he began to show his psychotic thinking and the whole pattern is that of an increasingly severe depression that became psychotic. (Tr. July 25, 1983, p. 666).

The Doctor explained that a person may be psychotic and not appear too bizarre in their behavior to a casual observer. He also noted that bizarre thinking under such circumstances may stretch over a period of weeks, months, or years (Tr. July 25, 1983, p. 582). At the time of the Guilty but mentally ill hearing, the psychosis was in remission (Tr. July 25, 1983, p. 583).

Dr. Satten also noted that Louis Hastings had no history whatsoever of "antisocial involvements or any brushes with the law" (Tr. July 25, 1983, p. 562). He believed that in his work with Mr. Hastings, Mr. Hastings "was substantially telling [him] the truth" (Tr. July 25, 1983 p. 578). Dr. Satten had not been made aware of any physical problems that might have contributed to Mr. Hastings' mental state. Mr. Salemi, who should have been aware that Mr. Hastings had exhibited elevated copper levels, aware of Dr. Thayer's letter, and aware that Mr. Schauss had been researching Mr. Hastings' condition, asked Dr. Satten the following question and received the following answer:

> Q.  Comparing his thinking about his physical health with what we know objectively and we haven't ordered an extensive physical examination, was his thinking about that rational [referring to his feeling that his body was falling apart]?
> A.  He does not appear that way, but I can't say without an examination of his body. (July 25, 1983, pp. 572-73).

Dr. Satten had been at least impliedly misled by Mr. Salemi, then, about what sort of physical investigations had been conducted. This conclusion is further born out during

9  Hastings v. Alaska -- Memo

000016

000993

Hastings v. Luna
Case No. 3:06-cv-0037-TMB                Attachment to Supplement to              Page 17 of 64
                                         Petition for Writ of Habeas Corpus

:tant District Attorney's cross-examination of Dr. Satten, which shows that

n was kept in the dark about the heavy metal toxicity defenses:

Q. To your knowledge, is he suffering from any brain damage, any physical
syndrome?
A.   To my knowledge, he is not.
Q.   There are no physiological injuries that might account for bizarre mental
ior such as tumors on the brain or any other sorts of physical things that you are
: of that might explain his conduct, is there?
A.   There are none that I can--that I'm aware of.  (Tr. July 25, 1983, p. 662).

The handling of Metal Toxicity evidence and Mental Defenses

Dr. Satten's qualified agreement with the statement that there were no physiolocal

aries that might account for Louis Hastings' bizarre "mental behavior" was the direct

:ult of Mr. Hastings' defense attorneys not informing themselves and the defense

:ychiatrist about the metal toxicity theory.  They initiated an investigation, but failed to

omplete it, failing to even obtain information about what their own experts had done

and could do to support mental defenses before Mr. Hastings pled no contest to every

charge he faced.  They even failed to investigate the matter before the guilty but mentally

ill hearing, allowing the prosecutor to cross-examine to establish that apparently there

was simply no organic explanation for the theory that Mr. Hastings was not in his right

mind at the time of the killings.  Needless to say, then, they failed to inform Mr. Hastings

about what was going on.

Arguments and Authorities

Issue:  Mr. Hastings was denied the effective assistance of counsel because his
attorney failed to fully and correctly advise him of the results and progress of
investigation into a heavy-metal-induced-psychosis defense, instead falsely leading
him to believe that this line of inquiry was completely hopeless, and such failure on
the part of counsel caused Mr. Hastings to enter his pleas of no contest.

Generally, in order to set aside a conviction under the Federal standard for

ineffective assistance of counsel, one must show first that counsel's performance was

deficient and secondly that the deficient performance prejudiced the defense.  This

**000**

10  Hastings v. Alaska -- Memo

000994

second prong requires a showing that but for the unprofessional error or errors in question there is a reasonable probability that the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668 (1983). Under Risher v. State, 523 P.2d 421, 425 (Alaska 1974), the prejudice prong only requires that the defendant create a reasonable doubt that counsel's incompetence contributed to the conviction. Counsel has a duty to "consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution" 466 U.S. at 688. As noted in Strickland, counsel also has a duty to conduct a competent investigation. The general rules for determining whether ineffective assistance of counsel has been rendered were adapted to cases where the defendant pleads guilty or no contest in Hill v. Lockhart, 474 U.S. 52 (1985). When a defendant enters a guilty plea upon counsel's advice, the voluntariness of the plea depends first on whether the advice was within the range of competence demanded of attorneys in criminal cases. The second, or "prejudice," prong of the test requires the defendant to show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty or no contest and would have insisted on going to trial. The constitutional right to effective assistance entitles the defendant to know the options open to him; this requires that counsel fully inform him of those available options. Smith v. State, 717 P.2d 402 (Alaska App. 1986).

In the present case, Mr. Hastings' attorney did not advise him of the evidence that was available to him. He did not keep Mr. Hastings fully informed. Mr. Hastings was simply led to believe that there was no hope of marshaling any evidence to support a heavy-metal-induced-psychosis defense. Whether this was the result of Mr. Salemi not keeping himself informed of what the experts contacted were doing or could do, or whether it is the result of Mr. Salemi not conveying such information to Mr. Hastings does not matter. Either way, Mr. Salemi failed to perform in a reasonably competent manner. Having noted an avenue that needed to be explored, he was not permitted to

11  Hastings v. Alaska -- Memo

**000018**

000995

unreasonably abandon that avenue without determining whether it had any promise. Furthermore, he was not permitted by standards of reasonable competence to tell his client that there was nothing to the heavy-metal-induced-psychosis theory when the experts contacted had not reached this conclusion, but rather had suggested that further investigation was warranted and would support such a defense theory. There is no possible tactical reason for failing to fully investigate the theory of heavy metal toxicity; nor is there any tactical reason for failing to inform Mr. Hastings of what the experts had to say. Mr. Hastings, as alleged in his affidavit, which has been incorporated by reference herein, would not have pled guilty but for his attorney's unprofessional conduct in failing to apprise him of the information provided by Alex Schauss and Dr. Thatcher. A mistake made out of ignorance cannot later be validated as being tactically defensible. See State v. Jones, 759 P.2d 558 (Alaska App. 1988).

Various defenses to murder were available to Mr. Hastings. Under an insanity defense, he would have been required to show that he was unable as a result of mental disease or defect to appreciate the nature and quality of his conduct. The showing of "guilty but mentally ill" would not have relieved him of criminal responsibility and would have required a finding that as a result of his mental disease or defect he lacked the substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. Leaving aside the issues of insanity and "guilty but mentally ill," Mr. Hastings had a complete right to present proof of a mental disease or defect as tending to disprove mens rea. Despite the limitations on the insanity defense that had become operative before the time of Mr. Hastings' pleas, the State was still required to prove "a voluntary act" and a "culpable mental state" under Alaska Statute 11.81.600. Hart v. State, 702 P.2d 651 (Alaska App. 1985). Furthermore, Alaska Statute 12.47.020, mental disease or defect negating culpable mental state, provides:

(a) Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a

**000019**

12  Hastings v. Alaska -- Memo

**000996**

Hastings v. Luna
Case No. 3:06-cv-0037-TMB                  Attachment to Supplement to
Petition for Writ of Habeas Corpus                          Page 20 of 64

culpable mental state which is an element of the crime. However, evidence of mental disease or defect that tends to negate a culpable mental state is not admissible unless the defendant, within 10 days of entering a plea, or at such later time as the court may for good cause permit, files a written notice of intent to rely on that defense.

(b) When the trier of fact finds that all other elements of the crime have been proved but, as a result of mental disease or defect, there is a reasonable doubt as to the existence of a culpable mental state that is an element of the crime, it shall enter a verdict of not guilty by reason of insanity. A defendant acquitted under this subsection, and not found guilty of a lesser included offense, shall automatically be considered to have established the affirmative defense of insanity under AS 12.47.010. The defendant is then subject to the provisions of AS 12.47.090.

(c) If a verdict of not guilty by reason of insanity is reached under (b) of this section, the trier of fact shall also consider whether defendant is guilty of any lesser included offense. If the defendant is convicted of a lesser included offense, the defendant shall be sentenced for that offense and shall automatically be considered guilty but mentally ill under AS 12.47.030 and AS 12.47.050. Upon completion of a sentence for a lesser included offense, a hearing shall be held under AS 12.47.090(c) to determine the necessity of further commitment of the defendant, based on the acquittal for the greater charge under (b) of this section. If the defendant is committed under AS 12.47.090(c), the defendant is subject to the provisions of AS 12.47.090(d)-(j).

Thus, Mr. Hastings was very legitimately interested in the question of whether there would be a way to prove that he was not in his right mind at the time of the killings. The heavy metal poisoning information would have corroborated the fact that he was psychotic at the time of the shootings and very well could have caused a jury to harbor reasonable doubts about his mental state. Certainly, Mr. Hastings could have and would have reasonably made a completely different decision regarding whether to plead guilty if he had been fully informed of his options and the potential evidence that could be put together in support of pursuit of those options.

**000020**

**000997**

<u>Conclusion</u>

For the reasons stated above, Mr. Hastings was denied the effective assistance of

counsel.  He is entitled to have his pleas of no contest set aside on all counts.

Respectfully submitted,


Benjamin C. Wood, KS 11788
112 S.W. 6th St., Suite 302
Topeka, KS 66603
913-296-6555


Rex Lamont Butler
Rex Lamont Butler and Associates
745 West 4th Ave., Suite 300
Anchorage, Alaska  99501
907-272-1497


000021

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT

STATE OF ALASKA,                )
                                )
              Plaintiff,        )
                                )
      vs.                       )
                                )
LOUIS D. HASTINGS,              )
                                )
              Defendant.        )
                                )
_____ )

Case No. 3ANS-83-1300 CR

## AFFIDAVIT OF LOUIS HASTINGS

STATE OF KANSAS           )
                          )   ss.
COUNTY OF LEAVENWORTH     )

    LOUIS HASTINGS, upon his oath, deposes and states as follows:

    1.  I am the defendant in the above-titled action.  I had no criminal record prior to the homicides in question. I had no history of violence.

    2.  I am executing this Affidavit in support of my Motion to withdraw my no contest plea.

    3.  The Motion is based on my belief that I was denied my constitutional right to effective assistance of counsel.

    4.  My trial attorney was assistant Public Defender John Salemi.

    5.  During the summer of 1982, I applied a preservative to logs.  This preservative contained copper napthalate.  I came in contact with a great amount of this preservative.  In addition, during the winter of 1982-1983, I scraped a substantial amount of lead based paint off

001011    000034

woodwork in my cabin. This scraping created a large amount of dust which I inhaled. I did not wear a protective mask while doing this work. Further, I felt sick for several days after my contact with the preservative containing copper napthalate. Additionally, I had started drinking spring or stream water in Kennicott (primarily spring water), at the site of the extensive copper mining operation, in the summer of 1982 and continuing up until the time of the homicides. I had also previously been exposed to new copper pipes in an area with soft water.

6a. While he was representing me, John Salemi had a laboratory analysis done on my blood and hair samples. My hair samples showed abnormally high levels of copper and showed depressed lithium levels, which suggest the presence of toxicity. My attorney advised me lab work had demonstrated elevated copper levels and gave me a copy of the laboratory analysis documents. I had been advised by counsel of the relationship between high levels of copper and violent behavior. The above information was significant to me because if developed, it could have been a defense to the merits of the crimes charged and my attorney so suggested. We therefore agreed within our attorney-client relationship that these matters should be further investigated. My attorney also suggested that the copper toxicity theory could be a basis for a GBMI finding. Again, we therefore agreed within our attorney-client relationship that this should be further investigated to this end.

2

000035

001012

b.    I requested that my attorney move for a
continuance so that he could pursue the toxicity defense
theory and he declined to do so.  He indicated that he had
not received any response from experts positive enough to
merit the request for continuance.  I had no direct contact
with the experts nor had I seen anything in writing from
them; the only scientific documents I had seen on this
subject were those referred to above.  Given the negative
report and the denial of my asking for a continuance request
I entered my pleas of no contest to all charges with no
consideration for having done so.

c.    Subsequent to my entry of my plea of no contest,
the Public Defender office received a letter from one of the
experts, Dr. Robert Thatcher.  It was dated 3 days before my
pleas and referred to a conversation between Mr. Callow, who
was Mr. Salemi's assistant, and Dr. Thatcher.  (Exhibit A).
The details of the information contained in this letter had
not been conveyed to me at the time of my plea.  This letter
indicated that: 1) my elevated copper levels could be a sign
of copper toxicity at the time of the homicides; 2) a
behavior disorder similar to a psychosis could have been
caused by this toxicity;  3) it would seem to have been
necessary to investigate whether my copper level at the time
of the homicides could be established by extrapolation.
None of these specifics was conveyed to me prior to my entry
of pleas of no contest.  Had these specifics been conveyed

**000036**

3

**001013**

to me I would not have plead no contest and would have insisted on going to trial.

d.    Further, I had been made aware that an expert by the name of Alec Schauss would be doing scientific analysis. However, I was not made aware of what work had been done, what findings had been made, or what further work was suggested by Alec Schauss. I was not advised of any of the following in regard to Alec Schauss and/or his involvement in my case:

1.    That Alec Schauss possessed an extensive reputation as one of the pre-eminent experts in the field at issue.

2.    What Alec Schauss' qualifications were, nor that they were specifically and directly related to my situation.

3.    That Grant Callow and Alec Schauss had had any difficulties in communication with one another or that Mr. Callow harbored any doubts about Alec Schauss' expertise.

4.    I did not know that Alec Schauss had proceeded as follows in his own words: "As per the instructions of Mr. Hasting's defense counsel, Mr. Grant Callow, Assistant Public Defender, in the fall of 1983, I proceeded to study his behavior prior to the time of arrest, analyze his sub-occipital (nape) hair and beard tissue, serum, plasma amino acid, and blood results. Samples of Mr. Hasting's hair, serum and blood were taken in early November, 1983. If our analyses of this reports discerned anything of significance, we agreed to discuss this with our other investigators

4

001014    000037

familiar with forensic psychiatry, neurology, and disorders of brain metabolism. Our preliminary report would then be discussed with Mr. Callow. If he felt there was sufficient cause to proceed with the preparation of a defense, he would request our findings be written up and sent to him. He would then solicit the necessary funds to complete any tests, interviews, etc., required to complete the investigation. As a first step he agreed to assist us in gathering laboratory samples of Mr. Hasting's."

5.   Nor did I know that Alec Schauss had actually done the following or had the potential to do the following:

a.   Noted an elevated copper level in my beard hair.

b.   Published an article on the link between elevated copper levels and aggression two years earlier.

c.   Contacted Dr. Carl Pfeiffer, Director of the Bio-Brain Research Center in Princeton, who recommended additional tests, who was then the foremost authority on the subject.

d.   Noted possible frontal lobe dysfunction in me and contacted Dr. Anneliese A. Pontius, M.D., at Harvard University School of Medicine who expressed a willingness to testify contingent upon additional testing.

e.   Contacted Dr. William Walshi, Ph.D. at the Argonne National Laboratory near Chicago, who offered assistance, including agreement to assist regarding scientific determination of the significance of my depressed lithium levels.

**000038**

5

**001015**

f.    Contacted Dr. Maurice Bowerman, M.D. in Portland Oregon, a psychiatrist and former medical director of the Oregon Department of Corrections with expertise in disorders of mineral metabolism, enzyme disturbances and antisocial behavior.

g.    That Mr. Schauss had consulted his medical director, Dr. Thieiu-L-Ngheim, M.D.

h.    That Alec Schauss intended to attempt to scientifically recreate my metabolic status at the time of the homicides.

Had I been made aware that Alec Schauss even had the potential to do what he did, I would not have pled no contest to any of the charges in this case.

7.    On the morning my case was set for trial, Mr. Salemi told me that he had not had enough time to develop this toxicity theory as a defense to the merits. In addition, Mr. Salemi indicated that he would develop this theory for the GBMI hearing because he would have more time. This was another consideration in my decision to plead no contest. As it turned out, he had stopped investigating the toxicity/metabolic theory. However, he did not tell me that he had stopped investigating this theory until the day before the GBMI hearing.

8.    The only attempt at follow-up investigation of which I am aware is a May 30, 1984, letter to Dr. Thatcher which I drafted for Mr. Salemi's signature, Exhibit B, attached. This letter was my response to Dr. Thatcher's

6

**000039**

**001016**

UNIVERSITY OF MARYLAND
SCHOOL OF MEDICINE
10 South Pine
Baltimore, Maryland 21021

FILED
2 1983
P... ...gency

Applied Neuroscience Laboratories - UMES                December 2, 1983

Mr. Grant Callow
Assistant Public Defender
900 W. 5th Avenue, Suite 200
Anchorage, Alaska 99501

Dear Mr. Callow;

    This is to summerize my analyses of Mr. Lewis Hasting's hair and blood analysis results. As I mentioned in our telephone conversation, the hair analyses did not indicate the presence of heavy metal toxins. However, the analyses did indicate possible trace element imbalances. For example, the results showed an excess of calcium, magnesium and copper. These excesses were accompanied by a relatively low level of chromium. The high calcium and magnesium levels and the low chromium may be a sign of functional hypoglycemia. As we discussed, these data by themselves do not seem sufficient to cause Mr. Hastings to be "unable to appreciate the nature and quality of his or her conduct".

    It should be noted that hair is particularly susceptible to external copper contamination; a problem encountered in head hair samples. Therefore, in the present report I will comment only on the results of the pubic hair analyses which are much less likely to be contaminated. Given this background, the elevated copper levels noted in Mr. Hasting's pubic hair sample may be a sign of copper toxicity. Of particular relevance is the known association between behavioral changes, mood swings and agressiveness and copper toxicity (see "Trace Elements in Human and Animal Nutrition" E.J. Underwood, Academic Press, New York, 1977). As I mentioned, it is possible that if Mr. Hastings' hair sample had been obtained immediately after the commission of the crime the levels of copper may have been even higher then they were, approximately six months later. Given the deleterious consequences of copper toxicity, if the copper levels were excessive for a long period of time it is possible that a behavioral disorder, similar to a psychosis, may have been present at the time of Mr. Hastings' criminal actions. Of course this is only hypothetical, given the time lapse between the commission of the crime and the time that the pubic hair sample was taken.

    In regard to a statement of cost for my services, I spent approximately one half day analyzing the data and performing a library search. My charge is $150.00 for this service. A check should be sent to me at the above address.

    I enjoyed our conversations and hope that these analyses will be of some help.

With best regards.

EXHIBIT    A

000044

001021

Sincerely,

Dr. Robert W. Thatcher
Professor and Director

000045

001022

# STATE OF ALASKA

### PUBLIC DEFENDER AGENCY

BILL SHEFFIELD, GOVERNOR

900 W. 5th Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 279-7541

May 30, 1984

Robert W. Thatcher, M.D.
University of Maryland
    School of Medicine
10 South Pine
Baltimore, Maryland  21021

Dear Dr. Thatcher:

After reviewing your report on the hair samples taken from our client, Louis Hastings (dated 2 December 1983), we have some questions for you that we hope will help us decide whether to do some followup investigation.

Mr. Hastings reports being exposed to copper and lead within a few months of the day he shot eight people. The lead came in the form of fine paint dust raised while he scraped old lead-based paint off of some cabinets. He used no dust mask. His copper exposure occurred while applying a preservative containing copper napthalate to logs. He reports heavy skin contact and breathing of some wind-borne spray, and says he felt ill for two days after using the log preservative.

Could these exposures account for the elevated levels of copper you found in Hastings' pubic hair samples?  Assuming no subsequent exposure, can you extrapolate a probable level of intoxication on March 1, 1983, from the level you found on ?? November, 1983?  Finally, is there any synergism between copper and lead that would produce psychosis at levels not usually considered toxic?

Sincerely yours,

*no response to this letter.*

John B. Salemi
Assistant Public Defender

000043

JBS: mc

B

001020

Sincerely,

Dr. Robert W. Thatcher
Professor and Director

nn0042

001019