## Affidavit

COUNTY OF PINELLAS )
                   ) ss:
STATE OF FLORIDA   )

DR. ROBERT W. THATCHER, Ph.D., of lawful age, being first duly sworn, states:

1. In December of 1983 and earlier, I worked in the Applied Neuroscience Laboratories at the University of Maryland School of Medicine.

2. I was contacted by legal counsel for Mr. Louis Hastings and asked to evaluate the relationship between certain hair and blood analysis results and Mr. Hastings' behavior.

3. I authored the attached letter of December 2, 1983, addressed to Mr. Grant Callow.

4. I did not receive the attached letter of May 30, 1984, or any other follow-up phone calls or correspondence regarding Mr. Hasting's case.

5. I was not made aware of the fact that Alex Schauss was involved with the Hastings' case in any way.

6. I would have been available to testify at a trial in Alaska regarding the capacity of copper to cause behavioral disorders.

7. If it had been possible to extrapolate higher copper levels in Mr. Hastings at the time of his crimes, scientifically, this would have strengthened a conclusion that his behavior was affected by copper toxicity.

Robert W. Thatcher, Ph.D.

000028

001005

Hastings v. Luna
Case No. 3:06-cv-0037-TMB          Attachment to Supplement to
Petition for Writ of Habeas Corpus          Page 33 of 64

STATE OF FLORIDA                           )
COUNTY OF COUNTY OF PINELLAS)  SS:

    Dr. Robert W. Thatcher, Ph.D., being first duly sworn upon his oath, states:  That he is the Affiant above-named; that he has read the above and foregoing Affidavit, knows the contents thereof, and that the allegations contained therein are true and correct to the best of his knowledge and belief.



                                          Dr. Robert W. Thatcher, Ph.D.

    SUBSCRIBED AND SWORN  to before me this _____1st_____ day of
____March____, 1995.

OFFICIAL S. AL
REBECC
My Com
    J  .  9.
Comm.  No  1.

Rebecca A. Walter
Notary Public

My Appt. Expires:
___July  4, 1996___

OFFICIAL SEAL
REBECCA A. WALKER
My Commission Expires
July 5, 1996
Comm. No. CC 213724

**00 0029**

**001006**

Attachment--Affidavit of Alexander Schauss

000022

**Affidavit**

COUNTY OF PIERCE                     )
                                     ) ss:
STATE OF WASHINGTON                  )

    ALEXANDER G. SCHAUSS, Ph.D., of lawful age, being first duly sworn, states:
I am the director of AIBR Life Sciences Division, American Institute for Biosocial Research, Inc. Originally the undersigned was retained as a consultant by the Alaska Public Defender's Agency to evaluate the possibility that Mr. Louis Hastings' behavior may have been due to a biochemical or metabolic disorder. As per the instructions of Mr. Hastings' defense counsel, Mr. Grant Callow, Assistant Public Defender, in the fall of 1983, I proceeded to study his behavior prior to the time of arrest, analyze his sub-occipital (nape) hair and beard tissue, serum plasma amino acid, and blood results. Samples of Mr. Hastings' hair, serum and blood were taken in early November, 1983. If our analyses of these reports discerned anything of significance, we agreed to discuss this with other investigators familiar with forensic psychiatry, neurology, and disorders of brain metabolism. Our preliminary report would then be discussed with Mr. Callow. If he felt that there was sufficient cause to proceed with the preparation of a defense, he would request our findings be written up and sent to him. He would then solicit the necessary funds to complete any tests, interviews, etc., required to complete the investigation. As a first step he agreed to assist us in gathering laboratory samples from Mr. Hastings.

    All laboratory reports were sent to our Institute in November, 1983. Our first observation noted an elevated copper level in his beard hair. This was a significant finding, since we had published papers two years earlier corroborating an association between excessive levels of copper in hair, imbalanced copper and zinc hair ratios, and histories of aggression. We proceeded to contact the world's foremost authority on this subject, Dr. Carl Pfeiffer, M.D., Ph.D. Director of the BioBrain Research Center in Princeton. He strongly urged relatively inexpensive additional corroborative tests, including measures of intracellular copper, zinc, manganese and pyridoxine levels, and an 8 hour urinary excretion study. He also expressed a willingness to testify in the court of trial jurisdiction should these tests prove supportive. His research on the subject began in the 1960's and was initially published during his residency at the New Jersey Neuropsychiatric Institute in 1971.

    We also noted behavioral evidence described by Mr. Hastings' counsel suggesting frontal lobe dysfunction affecting the ability to switch the principle of action (POA) of that brain region. The significance of this suspicion might be illustrated by the work of several investigators who published relevant findings on this subject in the *Journal of Nervous and Mental Diseases* in 1980. When a burglar is interrupted by the sudden appearance of the apartment owner, we find a variety of hierarchically more anti-social or inappropriate behaviors possible. The least socialized response indicating a disturbance of POA would be to start a fight or kill the owner. At the other end of the continuum, an ability to switch POA appropriately would be to act surprised, refrain from stealing, and act as if he entered the apartment in error, leaving in a non-destructive and

000023

001000

controlled fashion. Obviously if for some reason his cognitive processes, judgment and reasoning were disturbed, or else if he were under a paranoid delusion, POA response may be modified, resulting in the least socialized behavior. In order to be able to test this hypothesis in light of our initial metabolic findings of copper disturbance, I contacted Dr. Anneliese A. Pontius, M.D. at Harvard University School of Medicine's McLean Hospital, Institute of Law and Psychiatry. Given her familiarity with our research, we were able to interest her in this case. She was willing to testify in this matter if further testing was approved by the public defender's office. We also familiarized her with our protocol for such tests, using computerized EEG readings, performed by a team of neuropsychologists and psychiatrists.

We had also noted in Mr. Hastings' serum trace analysis results elevated copper levels, extremely low lithium levels, and undetectable levels of cobalt. This and the elevated levels of sodium and phosphorous were of significance to this case. Only that summer a fellow researcher, Dr. William Walsh, Ph.D., at the Argonne National Laboratory near Chicago, reported on his studies of extremely violent antisocial inmates held in the Illinois prison system. He reported to a May, 1983, meeting that he had found some very consistent but abnormal hair trace element patterns in violent offenders in his sophisticated laboratory. I contacted Dr. Walsh about our Mr. Hastings. Listening to the study of select offenders, he suggested that there were significant similarities to his own study of select offenders except that Mr. Hastings' prior history was completely out of character with what might be expected from such results. He offered to testify in this matter if his findings could explain the significance of our laboratory results. He also offered to have Mr. Hastings' hair, serum and blood subjected to "blind" analysis at no charge, using highly sophisticated analytical techniques that few facilities in the world had available. He also indicated that he had begun developing a treatment protocol with Dr. Pfeiffer in Princeton that could be presented as a treatment option in Mr. Hastings' case.

The finding of significantly depressed lithium was also relevant in this case. A research study in Texas in the early 1970's had discovered a powerful inverse association between levels of lithium in water and rates of antisocial behavior and rates of admission to mental institutions in 27 Texas counties, independent of such sociocultural factors as population density, race, or socioeconomic status. (This finding has been corroborated by the University of California and a leading research institution in Venezuela.) Dr. Walsh agreed to determine Mr. Hastings' lithium levels at the lowest threshold levels.

We next contacted Dr. Maurice Bowerman, M.D., in Portland, Oregon, a retired medical director of the Oregon Department of corrections, then in private practice. Dr. Bowerman and I had studied a felon in 1977 for one of Oregon's public defender offices, so I was familiar with his ability as a psychiatrist and his familiarity with disorders of mineral metabolism, enzyme disturbances and antisocial behavior. A report from Mineralab, Inc., in Hayward, California, of Mr. Hastings' plasma amino acid levels found abnormally high levels of an amine that affects brain function. Whether this was due to the disorders of metabolism linked to excess copper we had uncovered, or some other factors was a matter we hoped Dr. Bowerman would be willing to investigate if approved by the Alaska public defender's office.

000024

001001

Hastings v. Luna
Case No. 3:06-cv-0037-TMB                    Attachment to Supplement to
                                             Petition for Writ of Habeas Corpus                    Page 37 of 64

Finally, we felt that integrating all of this information from various doctors would be our medical director, Dr. Thieu-L-Ngheim, M.Sc., M.P.H., D.P.H., M.D. As our medical director, he would be willing to testify in court as to the significance of these findings, especially owing to his close proximity to Alaska. At the time he was also a state epidemiologist in Washington, having held previous positions at Wayne State University School of Medicine, Harvard University School of Medicine, the Mayo Clinic, and Johns Hopkins University School of Medicine.

Mr. Callow also agreed that if we felt it necessary he would arrange to have someone from our Institute flown to Alaska to personally interview Mr. Hastings and go to the site of the crime to gather water and soil samples. We made arrangements with several labs to receive coded split samples for "blind" analysis.

It was also our intent to see if it would be possible to re-create the metabolic status of Mr. Hastings at the time of crime under laboratory conditions. With the assistance of neurologists and psychiatrists at the State of New York University in 1982, we had done exactly this type of study in another case, involving the shooting of more than 12 people. In that matter, despite numerous eyewitnesses, the court dismissed the case against the defendant. The defendant, who faced a life sentence, was subsequently treated for his metabolic disorder. (To this day he has not been re-arrested for any offense and remains a successful community-oriented businessman. This defendant set up a research institute in his state to study metabolic disorders causing criminal behavior which would have been available to Alaska's court or our Institute if required.) I contacted Dr. Herbert Kaye, Ph.D. at SUNY who agreed to conduct the necessary neurophysiological studies at his laboratory at the university or at a West Coast university facility.

After considerable study of Mr. Hastings' preliminary laboratory results in early December, 1983, it was my opinion that there were reasonable grounds to develop several defenses for him. Which one depended on the outcome of several additional, although not expensive (less than $1,000 collectively), tests.

None of this information was ever sought by Mr. Callow. To this day I still have no knowledge of why this case was ever brought before the court given our preliminary findings and the availability of such eminently qualified expert witnesses. If the evidence in Mr. Hastings' case was adequate, and a defense, such as diminished capacity, had been presented in court, I would not be surprised that by now he would be out of prison, rather than continuing to remain institutionalized at a Federal facility for life.

Alexander G. Schauss, Ph.D.

000025

001002

STATE OF WASHINGTON )
COUNTY OF PIERCE        ) ss.

     Dr. Alexander G. Schauss, being first duly sworn upon his oath, states: That he is the Affiant above-named; that he has read the above and foregoing Affidavit, knows the contents thereof, and that the allegations contained therein are true and correct to the best of his knowledge and belief.

                                         Alexander G. Schauss, Ph.D.

     SUBSCRIBED AND SWORN to before me this _20_ day of _____,
1995.

                                     Notary Public

My Appt. Expires:

_01 29 99_

000026

001003

Attachment--Affidavit of Dr. Robert Thatcher

000027

001004

ATTORNEY AT LAW
750 W. 2ND AVENUE, SUITE 207
ANCHORAGE, AK 99501
PHONE: (907) 272-7871 FAX: (907) 272-7971

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

LOUIS D. HASTINGS,                    )
                                      )
          Petitioner,                 )
                                      )
     v.                               )
                                      )
STATE OF ALASKA,                      )
                                      )
          Respondent.                 )
_____)

Case No. 3AN-96-4823 CI
t/w Case No. 3AN-S83-1300 CR

STATE OF ALASKA              )
                             )ss:
THIRD JUDICIAL DISTRICT      )

## AFFIDAVIT OF WM. GRANT CALLOW

This document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any offense unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

     I, Wm. Grant Callow, having been duly sworn, hereby depose and state as follows:

     1.   At the time of Mr. Hastings case in 1983, I was employed by the State of Alaska Public Defender Agency in the position of Assistant Public Defender.

     2.   I make these statements to the best of my recollection at this time.

     3.   I was involved with Mr. Hastings' case only at the initial phase.

     4.   I recall that I read an article in <u>Science News</u>, discussing one or more scientific studies correlating episodes of psychotic behavior with exposure to certain so-called heavy metals.

000078

000558

ATTORNEY AT LAW
750 W. 2ND AVENUE, SUITE 207
ANCHORAGE, AK 99501
PHONE: (907) 272-7871 FAX: (907) 272-7971

5.    I turned this information over to Assistant Public Defender John Salemi, along with the names of certain organizations and individuals who I understood had been involved in such research.  I also recall having some preliminary discussions with certain individuals who professed to have some expertise in the subject and who I thought might serve as expert witnesses in the case. I provided the names of those individuals to Mr. Salemi.

6.    I was later advised by Mr. Salemi that hair samples taken from Mr. Hastings had been tested and had not produced information that was helpful to the defense.

7.    Beyond this, I was not involved in Mr. Hastings' defense.  Mr. Salemi was the attorney assigned to represent Mr. Hastings and who was solely in charge of representing him in defense of the criminal charges brought against him.

8.    I did discuss the <u>Science News</u> article with Mr. Hastings.

9.    I was not involved in any discussions or decisions regarding Mr. Hastings' decision to enter a plea or regarding his defense.

FURTHER AFFIANT SAITH NAUGHT.

DATED at Anchorage, Alaska this 27th day of August, 2001.

_____
Wm. Grant Callow


SUBSCRIBED AND SWORN to before me this 27th day of August, 2001.

_____
NOTARY PUBLIC IN AND FOR ALASKA
MY COMMISSION EXPIRES: 2/12/05

000079

Hastings, 3AN-96-4823 CI
Affid. Wm.G.Callow                    2              000559

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

LOUIS D. HASTINGS,                      )
                                        )
            Petitioner,                 )
                                        )
      v.                                )
                                        )
STATE OF ALASKA,                        )
                                        )
            Respondent.                 )
_____)

Case No. 3AN-96-4823 CI
t/w Case No. 3AN-S83-1300 CR

### NOTICE OF COMPLIANCE AND
### NOTICE OF FILING AFFIDAVIT OF JOHN B. SALEMI

This document and its attachments do not contain (1)  the name of a victim of
a sexual offense listed in AS 12.61.140 or (2)  a residence or business
address or telephone number of a victim of or witness to any offense unless it
is an address used to identify the place of the crime or it is an address or
telephone number in a transcript of a court proceeding and disclosure of the
information was ordered by the court.

      COMES NOW the Petitioner, LOUIS D. HASTINGS, by and through

appointed counsel of record, LINDA S. THOMAS, Attorney at Law,

and gives notice of compliance with the court's order, October 2,

2001 by this notice of filing the affidavit of John B. Salemi.

      Attached is the affidavit of John B. Salemi, Mr. Hastings'

trial counsel.

      DATED this _31st_ day of October, 2001 at Anchorage,

Alaska.

                              _Linda S. Thomas_
                              Linda S. Thomas, ABN 9111104
                              Counsel for Louis D. Hastings

### CERTIFICATE OF SERVICE

      This is to certify that on the _31st_ day of October, 2001, a true and
accurate copy of this document and its attachments were forwarded by
mail/messenger to Michael Sean McLaughlin, AAG, Office of Special Prosecutions
and Appeals, 310 K Street, Suite 308, Anchorage, Alaska 99501.

                              _Linda S. Thomas_
                              Linda S. Thomas

                    000293  000096

ATTORNEY AT LAW
750 W. 2ND AVENUE, SUITE 207
ANCHORAGE, AK 99501
PHONE: (907) 272-7871 FAX: (907) 272-7971

AFFIDAVIT OF JOHN B. SALEMI

Re: Louis Hastings/Request for PCR; Case No. 3ANS83-1300 Cr.

John B. Salemi, duly sworn, states on oath as follows:

1. I was the attorney assigned to represent Louis Hastings in connection with the criminal action brought against him in 1983 by the State of Alaska.

2. At the time of said appointment I was an employee of the Alaska Public Defender Agency.

3. I am supplying this affidavit at the request of Linda S. Thomas, Esq.

4. Both Ms. Thomas and the State of Alaska have recently sent me materials related to Mr. Hastings' case, including but not limited to my testimony from a prior PCR hearing, Mr. Hastings' applications for PCR, appellate decisions, various court orders, etc. I have reviewed the materials received. Neither party provided me with the affidavit of Grant Callow, which was referred to in various other documents.

5. Nothing I have reviewed has made my recollection of this matter any clearer in my mind than at the time I testified before Judge Carlson several years ago. Suffice it to say the passage of time has made my general recall of this case somewhat difficult, despite its notoriety.

6. I do remember Mr. Hastings as an intelligent, soft-spoken, passive, mild-mannered individual. Mr. Hastings always described his criminal acts as an outgrowth of the meaninglessness of life, the non-contingent nature of human life, and his need to both do away with his own life and at the same time make a statement/difference. It was crucial he mask his suicide.

7. Mr. Hastings never exhibited bizarre behavior, or even bizarre thinking, other than the thinking that was associated with and used to explain his grand scheme to kill the entire population of McCarthy, blow up the Trans-Alaska pipeline, and kill himself in the process. Put another way, when discussing legal issues as attorney to client, Mr. Hastings was rational, logical and even reasonable in his approach. Similarly, when

000294        000097

engaged in general conversation with Mr. Hastings, he was always socially appropriate, reality-based, and rational. If he were suffering from some form of heavy metal toxicity it seems it would have been exhibited in his thinking or behavior during our first meetings (which occurred within a couple of days of the criminal conduct in McCarthy).

8.  I don't recall the details concerning our efforts to establish a link between Mr. Hastings' criminal conduct and heavy metal toxicity. I do recall having some of his hair tested. Grant Callow was the contact person for the expert(s) we were utilizing. Contrary to what has been suggested, I believe Dr. Satten was advised of the test results. I believe it was Dr. Satten who pointed out Hastings' planning of the McCarthy events predated his exposure to the lead dust, copper, etc. The defense team shared virtually everything concerning the case with Dr. Satten in that he was our only hope for a trial defense. The other forensic psychiatrists we hired to evaluate Mr. Hastings could find nothing upon which to support a legal or factual defense.

9.  I don't recall specific conversations with Mr. Hastings that may have occurred concerning a continuance of the trial. I do recall that Mr. Hastings was very concerned about a woman friend down in the Bay Area (Palo Alto, I think) who had been subpoenaed to testify by Mr. Branchflower. Hastings' concern was so great that he indicated he would waive his right to a trial if that's what it would take to prevent the State from bringing this witness to Alaska.

10.  I will conclude by stating that the defense was very anxious to develop any potential defense for Mr. Hastings. As a defense attorney I was not particularly happy about pleading my client to the charges, knowing the massive penalty he would face based on his pleas. If I had sufficient facts to believe a diminished capacity/toxicity defense could be developed I would have pursued it.

Further affiant sayeth naught.

John B. Salemi

Subscribed and sworn before me on October 25th, 2001 at St. Johns, Michigan. Notary Public _____. Commission expires: _____

AUTUMN REDMAN
Notary Public, Clinton County, MI
My Comm. Expires Sept. 25, 2005

000295                          000098



# United States Department of the interior

## NATIONAL PARK SERVICE

ALASKA REGIONAL OFFICE
2525 Gambell Street, Room 107
Anchorage, Alaska 99503-2892



L7615 (ARO-REQ)

Orig· HW
cc FOI
RA

JUN 1 0 1992

Ms. Dana Rasmussen, Regional Administrator
U.S. Environmental Protection Agency
1200 6th Avenue
Seattle, WA 99801

Dear Ms. Rasmussen:

The National Park Service is considering acquiring the historic Kennicott mining town site and adjacent mining properties located in the center of the 13.2-million-acre Wrangell-St. Elias National Park. Listed as one of the nation's eleven most endangered historic landmarks by the National Trust for Historic Places, the fifty-plus structures in this town are an excellent representation of early 20th century mining technologies and lifestyles.

In 1990 Congress directed the Park Service to prepare a cost estimate for the clean-up of hazardous substances on the site. The NPS is now working with the owners of the surface estate (Great Kennicott Glacier Land Co.) and the subsurface estate (the Kennecott Corporation) to fulfill this mandate. The Kennecott Corporation is in the process of completing a comprehensive sampling program and clean-up plan for the site. The Kennecott Corporation has expressed an interest in beginning clean-up of the site in 1993.

In August of 1990 the town was listed by EPA on CERCLIS (ID# AKD 983073123), and the site has been scheduled this summer for a Preliminary Assessment (PA) by the Alaska Department of Environmental Conservation (ADEC). In order to complete clean-up planning, the Park Service would like any sampling associated with a Site Inspection (SI) to be completed this summer. We have requested that ADEC expedite the completion of the Preliminary Assessment, and request that EPA expedite scoring the site under the Hazard Ranking System, or identify and make arrangements for site investigation (SI) sampling before the end of the summer.

We recognize the exceptional nature of this request, along with EPA's regular policy for completing SI's with an "in-house contractor," and the constraints associated with contractor mobilization. The Park Service stands ready to assist in the completion of the PA/SI requirement, and to this end offers the following as an option. The Alaska Region of the Park Service presently has the firm Ecology and Environment, Inc., under contract to perform PA/SI's at other NPS sites. If necessary, the Service might

RECEIVED

001288    Ex. C, p. 1 of 2    0852    JUN 1 8 1992

2

arrange the above contractor to complete SI sampling to EPA protocols (under the auspices of an Interagency Agreement) during this summer.

We appreciate your timely cooperation in the completion of this PA/SI requirement. Questions may be directed to Joan Darnell, Chief of Environmental Quality, at (907) 257-2648.

Sincerely,

John M. Morehead
Regional Director

cc:
: .ndor, Commissioner, ADEC, Juneau
G. Schurtz, Kennecott Corporation

001289     Ex. C, p. 2 of 2     0853

STATE OF ALASKA                                    WALTER J. HICKEL, GOVERNOR

## DEPT. OF ENVIRONMENTAL CONSERVATION

SOUTHCENTRAL REGIONAL OFFICE                 Telephone: (907) 563-6529
3601 C Street, Suite 1334                          Fax: (907) 562-4026
Anchorage, AK 99503

                    CERTIFIED MAIL                      RECEIVED
                    RETURN RECEIPT REQUESTED
                    NO. P 762 750 729                OCT 15 1992

                    October 9, 1992                  SUPERFUND

Mr. Gerald D. Schurtz
Kennicott Corporation
10 East South Temple
P.O. Box 11248
Salt Lake City, Utah  84147

Dear Mr. Schurtz:

The Department of Environmental Conservation (DEC) conducts preliminary assessments
at sites suspected of past uncontrolled hazardous substance disposal. This work is funded
under a cooperative agreement with U.S. Environmental Protection Agency (EPA) under
the authority of the Comprehensive Environmental Response, Compensation, and Liability
Act (CERCLA or "Superfund").

DEC has recently completed a preliminary assessment for the Kennicott mine Site in
Kennicott, Alaska. Enclosed is a copy of the final report. The Environmental Protection
Agency is planning to perform additional site inspection work in the near future.

Thank you for your cooperation during the development of the preliminary assessment
report. If you have any questions regarding the report, please feel free to call Max
Schwenne at 563-6529.

                          Sincerely,

                          Svend Brandt-Erichsen
                          Regional Administrator

MS:el

cc w/o enclosure:
        Debbie Flood, EPA-Region 10
        Beth Potter, ADEC Juneau

cc w/ enclosure:
        Paul Pinard, ADEC MSDO

[SCRO\MAX\KENNICOT LTR

              001290          Ex. D                  0354

Agency

**≥EPA**

June 23, 1995

Reply to
Attn of:  HW-114

See List of Addressees

Dear Addressees:

The U.S. Environmental Protection Agency (EPA), through its contractor, Roy F. Weston, Inc. (WESTON), has completed the site investigation (SI) of the Kennicott Mine site, a privately owned inholding within the boundaries of Wrangell-St. Elias National Park and Preserve in Alaska.  A copy of the SI report is enclosed.

Based on a review of the SI report and other pertinent information, i.e. current ownership and an evaluation of the site using the hazard ranking system (HRS) model, EPA does not anticipate any further remedial action at this site under the Federal Superfund Program.  However, EPA's determination does not relieve the responsible parties from complying with appropriate Alaska state regulations in addressing existing areas of on-site contamination which may pose human health and/or environmental threats.  Such areas include the tailings piles and remaining oil spill areas.  Due to uncontrolled access in and around the tailings piles, EPA recommends that signs be posted, informing visitors of the nature of the tailings piles.

In addition, <u>analytical results of dust samples collected from cottages and buildings around the mill site revealed concentrations of lead, arsenic and copper</u> (Table 4-8, SI Report).  EPA recognizes <u>that the dust samples were</u> collected during a one-time sampling event and that the detections may be a result of dust accumulating in unoccupied buildings over a number of years.  Therefore, EPA <u>strongly recommends that, should an increase in occupancy of the surrounding cottages/buildings occur, further assessment of particulate migration from contaminant sources be conducted and that appropriate action be taken pending the outcome of the assessment.</u>

In reference to recent communications with staff of the Department of Interior and its bureau the National Park Service (NPS), the Park Service expressed its interest in acquiring the Kennicott Mine site for preservation and management purposes. NPS also expressed its intentions to work with state and federal authorities in addressing the human health and environmental concerns associated with this site should an acquisition occur. EPA, in previous conversations with the Park Service, has communicated its support and willingness to work closely with NPS in this matter.  EPA recognizes that management of the site by the

001291    Ex. E, p. 1 of 2    0355

Parks Service will alleviate concerns regarding site control and safety. EPA has also discussed the responsibilities a federal agency assumes under Section 120 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), should it acquire contaminated property, and has informed the Park Service of EPA's role and responsibilities under CERCLA should the Kennicott Mine site be transferred to National Park Service ownership.

As the SI report and other pertinent information is being shared with all interested parties, EPA is confident that informed decisions regarding future plans for this site will be made. If you have any questions, please feel free to contact me at (206) 553-1677, or Monica Rolluda of my staff at (206) 553-0323.

Sincerely,

James M. Everts, Chief
Superfund Response and Investigations Branch

Enclosure

List of Addressees:
    Rich Cormack, ADEC-Juneau
    Michele Brown, ADEC (w/o Enclosure)
    Jon Jarvis, USDOI-NPS
    Molly Ross, USDOI-NPS
    Shawn Mulligan, USDOI-NPS
    Al Ewing, EPA-Anchorage
    Steve Torok, EPA-Juneau (w/o Enclosure)
    Peter Nakamura, Division of Public Health-Juneau, AK
    John Turner, The Conservation Fund
    Brad Meiklejohn, The Conservation Fund
    James Harrower, Great Kennicott Land Company
    David B. Crouch, Kennecott Corporation
    Eric Yould, Friends of Kennicott

001292    Ex. E, p. 2 of 2    0356

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT

In the Matter of the )
Application for Post-Conviction )
Relief of )
)
LOUIS HASTINGS, )
)
Applicant. )
_____ )

FILED IN THE TRIAL COURTS
STATE OF ALASKA
AT VALDEZ

APR — 4 2003

Case No.: 3AN-96-4823 Civil

### ORDER GRANTING MOTION TO DISMISS

The state has submitted a motion to dismiss Louis Hastings'

application for post-conviction relief.    To decide this motion,

the Alaska Supreme Court has directed this court to review

Hastings' application for facial deficiency and determine

whether it states a prima facie claim for relief under Criminal

Rule 35.1(f)(1).    The Supreme Court has directed that this court

must disregard any materials relied on by the state that are not

attached to or incorporated by reference in the application.

The indictment charged that Hastings committed murder in

the first degree against six separate victims and attempted

murder against two others.  Hastings pleaded no contest to all

of the charges on the morning that the trial was scheduled to

begin.  Judge Moody imposed the maximum sentence for each

offense, a composite sentence of 634 years.

Hastings' application for post-conviction relief alleged

that: "I was denied the effective assistance of counsel because

*ORDER GRANTING MOTION TO DISMISS - 1*

Alaska Court System

G77A (9/9/03)rs

my attorney failed to correctly advise me of the results and
progress of investigation into a heavy-metal-induced psychosis-
based defense, instead falsely leading me to believe that this
line of inquiry was completely hopeless, and such failure on the
part of counsel caused me to enter pleas of no contest."
Hastings supported his application with a memorandum elaborating
on these allegations, an affidavit from Hastings, and affidavits
from two experts discussing the metal-psychosis defense.

The court later required Hastings to supplement his
application with an affidavit from his trial-court attorney,
John Salemi.  Salemi discussed the metal-psychosis defense in
the latter portion of his affidavit:

7.   Mr. Hastings never exhibited bizarre behavior, or even
     bizarre thinking, other than the thinking that was
     associated with and used to explain his grand scheme to
     kill the entire population of McCarthy, blow up the Trans-
     Alaska pipeline, and kill himself in the process.  Put
     another way, when discussing legal issues as attorney to
     client, Mr. Hastings was rational, logical and even
     reasonable in his approach.  Similarly, when engaged in
     general conversation with Mr. Hastings, he was always
     socially appropriate, reality-based, and rational.  If he
     were suffering from some form of heavy metal toxicity it
     seems it would have been exhibited in his thinking or
     behavior during our first meetings (which occurred within a
     couple of days of the criminal conduct in McCarthy).

8.   I don't recall the details concerning our efforts to
     establish a link between Mr. Hastings' criminal conduct and
     heavy metal toxicity.  I do recall having some of his hair
     tested.  Grant Callow was the contact person for the
     expert(s) we were utilizing.  Contrary to what has been
     suggested, I believe Dr. Satten was advised of the test

0858

*ORDER GRANTING MOTION TO DISMISS - 2*                *Alaska Court System*
                                              977 B (9/8/03) P

results.[1] I believe it was Dr. Satten who pointed out
Hastings' planning of the McCarthy events predated his
exposure to the lead dust, copper, etc. The defense team
shared virtually everything concerning the case with Dr.
Satten in that he was our only hope for a trial defense.
The other forensic psychiatrists we hired to evaluate Mr.
Hastings could find nothing upon which to support a legal
or factual defense.

9.    I don't recall specific conversations with Mr. Hastings
that may have occurred concerning a continuance of the
trial. I do recall that Mr. Hastings was very concerned
about a woman friend down in the Bay Area (Palo Alto, I
think) who had been subpoenaed to testify by Mr.
Branchflower. Hastings' concern was so great that he
indicated he would waive his right to a trial if that's
what it would take to prevent the State from bringing this
witness to Alaska.

10.   I will conclude by stating that the defense was very
anxious to develop any potential defense for Mr. Hastings.
As a defense attorney I was not particularly happy about
pleading my client to the charges, knowing the massive
penalty he would face based on his pleas. If I had
sufficient facts to believe a diminished capacity/toxicity
defense could be developed I would have pursued it.

This court "must accept as true all of the allegations in

the application and inquire whether those facts, if proven,

would entitle the applicant to the relief sought."[2] At this

stage, the court does not resolve factual disputes: "the

sufficiency of the pleadings must be assessed by viewing the

application and all factual information incorporated therein in

---

[1] In another portion of his application, Hastings stated that Dr.
Satten was the senior attending physician at Mount Sinai
Hospital, president of the Northern California Chapter of the
American Academy of Psychiatry and Law, and a professor at the
Presbyterian Medical Center in San Francisco.

[2] See Hampel v. State, 911 P.2d 517, 524 (Alaska App. 1996).

**0359**

*ORDER GRANTING MOTION TO DISMISS - 3*                     Alaska Court System
                                                          977 C (9/9/03)

the light most favorable to the applicant."[3]  If the application "sets out facts which, if true, would entitle the applicant to the relief claimed, then the court must order the case to proceed and call upon the state to respond on the merits."[4]

Hastings had to assert two elements to plead a claim of ineffective assistance of counsel: first, that his attorney failed to give him legal assistance within the range of competence expected from criminal law practitioners; and second, that there was a reasonable possibility that the attorney's lack of competence affected the outcome of the proceedings.[5]

Hastings' application adequately alleged the second element--that the information Salemi disregarded about the metal-psychosis defense could have affected Hastings' decision to plead no contest.  But to satisfy the first element, Hastings' application had to allege facts ruling out the possibility that Salemi made a sound tactical choice when he abandoned the metal-psychosis defense.[6]

---

[3] See DeJesus v. State, 897 P.2d 608, 618 (Alaska App. 1995).

[4] See State v. Jones, 759 P.2d 558, 565 (Alaska App. 1988).

[5] See Risher v. State, 523 P.2d 421, 424-25 (Alaska 1974); Garay v. State, 53 P.3d 626, 628 (Alaska App. 2002).

[6] See Jones, 759 P.2d at 569-570.

0860

*ORDER GRANTING MOTION TO DISMISS - 4*            *Alaska Court System*

977 D (9/9/03)

The first element poses a major obstacle, because Salemi's affidavit stated reasonable tactical reasons for his decision to abandon the metal-toxicity defense. In particular, Salemi consulted with a leading psychiatrist who pointed out that the metal-psychosis defense would break down, because Hastings planned his crimes before he was exposed to any toxic metals. But Hastings' application did not allege any contrary facts that would rule out the possibility that Salemi made a reasonable decision. Consequently, this court concludes that Hastings did not allege a prima facie claim.

THE COURT THEREFORE GRANTS the state's motion to dismiss the application.

Dated this 4th day of April 2003.

Joel H. Bolger
Superior Court
Judge Pro Tem

I certify that a copy of the
original was forwarded to:
on _4-4-03_ by _____     L. THOMAS
                        M. MCLAUGHLIN

**0361**

*ORDER GRANTING MOTION TO DISMISS - 5*

Alaska Court System

977E

Hastings v. Luna
Case No. 3:06-cv-0037-TMB          Attachment to Supplement to
                                   Petition for Writ of Habeas Corpus          Page 55 of 64

NOTICE

*Memorandum decisions of this court do not create legal precedent. See Alaska Appellate Rule 214(d) and Paragraph 7 of the Guidelines for Publication of Court of Appeals Decisions (Court of Appeals Order No. 3). Accordingly, this memorandum decision may not be cited as binding precedent for any proposition of law.*

## IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| LOUIS D. HASTINGS, ) | |
| ) | Court of Appeals No. A-8594 |
| Appellant, ) | Trial Court No. 3AN-96-4823 CI |
| ) | |
| v.   ) | MEMORANDUM OPINION |
| ) | |
| STATE OF ALASKA, ) | AND JUDGMENT |
| ) | |
| Appellee.   ) | [No. 4946 - November 24, 2004] |

Appeal from the Superior Court, Third Judicial District, Anchorage, Joel D. Bolger, Judge.

Appearances: Linda S. Thomas, Anchorage, for Appellant. Michael Sean McLaughlin, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: Coats, Chief Judge, Stewart, Judge, and Andrews, Senior Superior Court Judge.[*] [Mannheimer, Judge, not participating.]

COATS, Chief Judge.

Based upon his pleas of no contest, Louis D. Hastings was convicted of six counts of first-degree murder, and two counts of attempted murder.[1] This court affirmed

---

[*] Sitting by assignment made pursuant to article IV, section 11 of the Alaska Constitution and Administrative Rule 23(a).

[1] AS 11.41.100(a)(1)(A); AS 11.31.100.

Hastings's convictions on appeal.[2]  Hastings then filed an application for post-conviction relief arguing that his trial attorney provided him with ineffective assistance.  Specifically, Hastings claimed that his trial attorney did not adequately investigate nor adequately inform him about raising an insanity defense based on Hastings's exposure to copper in McCarthy.  Hastings claimed that he would not have entered his no contest plea had his attorney adequately investigated and informed him about this defense.  Superior Court Judge pro tem Joel H. Bolger dismissed Hastings's application on the ground that Hastings failed to state a prima facie case.  Hastings appeals this decision.  We conclude that Judge Bolger was correct in ruling that Hastings did not present any evidence that his attorney's decisions were ineffective.  We accordingly affirm Judge Bolger's order dismissing Hastings's application for post-conviction relief.

### *Factual and procedural background*

Hastings's convictions arose from his attempt to kill all the residents of the small town of McCarthy in 1983.[3]  The influx of money and people to Alaska disturbed Hastings.  He decided to end these trends by disrupting the flow of oil through the Trans-Alaska Pipeline.  Having decided to blow up a pump station on the pipeline, Hastings concluded that it was necessary to kill all of McCarthy's residents to eliminate them as possible witnesses.  In preparation for his plan, Hastings accumulated several firearms and at least 2,000 rounds of ammunition.  He also manufactured a silencer for a pistol he intended to use.  On March 1, 1983, as McCarthy's townspeople prepared to meet the weekly mail plane, Hastings systematically began killing them.  He succeeded

---

[2]    The underlying factual and procedural history of Hastings's case was provided in the resolution of Hastings's direct appeal.  *Hastings v. State*, 736 P.2d 1157, 1159 (Alaska App. 1987).

[3]    *Id.* at 1158.

– 2 –                                              4946

in killing six people and wounding two others.  One victim escaped, after she was wounded, by eluding Hastings as he searched for her.  The other surviving victim was able to escape by plane and alert state troopers.  The troopers flew into McCarthy and captured Hastings as he attempted to escape on a snowmachine belonging to one of his victims.[4]

Hastings pleaded no contest to the multiple charges of murder and attempted murder, while preserving the right to present psychiatric evidence that he had been guilty but mentally ill at the time of the offense.[5]  A three-day hearing was held on the question of whether Hastings should be found guilty but mentally ill.[6]  Hastings presented one witness, Dr. Joseph Satten, a psychiatrist.  The State presented two witnesses, Dr. David J. Coons and Dr. Irvin Rothrock — both psychiatrists.

Both Dr. Rothrock and Dr. Coons testified that Hastings had the ability to conform his conduct to the requirements of the law.  They testified that he did not suffer from any mental disease or defect which prevented him from forming the intent to kill.

Dr. Satten, Hastings's witness, testified that he did not believe that Hastings appreciated the wrongfulness of his conduct.  Dr. Satten concluded that Hastings knew what he was doing, however, emotionally Hastings did not comprehend or appreciate the wrongfulness of his actions.  Dr. Satten did believe that Hastings probably had the ability to conform his conduct to the requirements of the law.

---

[4]    *Id.*

[5]    *See* AS 12.47.030(a) ("A defendant is guilty but mentally ill if, when the defendant engaged in the criminal conduct, the defendant lacked, as a result of a mental disease or defect, the substantial capacity either to appreciate the wrongfulness of that conduct or to conform that conduct to the requirements of law.  A defendant found guilty but mentally ill is not relieved of criminal responsibility for criminal conduct and is subject to the provisions of AS 12.47.050.").

[6]    *Hastings*, 736 P.2d at 1158-59.

– 3 –                                                            4946

After hearing testimony from all three witnesses, as well as arguments from counsel, Superior Court Judge Ralph E. Moody found that Hastings had not established that he was guilty but mentally ill. This court affirmed Judge Moody's ruling on appeal.[7]

After much delay, in 1996 Hastings filed an application for post-conviction relief stating that his plea of no contest was defective, arguing:

> because I was denied the effective assistance of counsel because my attorney failed to correctly advise me of the results and progress of [the] investigation into a heavy-metal-induced-psychosis-based defense; instead falsely leading me to believe that this line of inquiry was completely hopeless, and such failure on the part of counsel caused me to enter pleas of no contest.

According to Hastings's application, during the change of plea hearing, Hastings and John B. Salemi, Hastings's trial attorney, informed the court that they had discussed the possibility of proceeding to trial using psychiatric defenses. Salemi had tests done on Hastings's blood and hair. The hair samples showed abnormally high levels of copper and showed depressed lithium levels. There is a correlation between high levels of copper in the body and violent behavior. Salemi advised Hastings that if this theory was developed, it could form the basis for a defense. According to Hastings, as the trial date approached, Salemi "had not received any response from the experts who had been contacted that was positive enough to merit the request for continuance." Consequently, Hastings pleaded no contest to the charges. (Hastings stated that he decided to plead no contest to spare his family the trauma of being involved in the case.)

Hastings obtained Salemi's affidavit to support his application for post-conviction relief. Salemi stated that he had reviewed the record in the case, including

---

[7]  *Id.* at 1159.

– 4 –                                                                                          4946

his prior testimony, and "[n]othing I have reviewed has made my recollection of this matter any clearer in my mind than at the time I testified [before the superior court]."

Salemi had previously stated that he had various psychiatrists evaluate Hastings and after discussing any psychiatric defenses, concluded that none would be successful. Salemi explained that he did not put much weight on the current elevated copper levels because Hastings had suicidal ideations, was violent and had had psychiatric problems his entire life. Salemi concluded that the "real problem with asserting that the copper toxicity theory had any impact on what happened in McCarthy was the fact that Mr. Hastings before he was exposed to copper had been planning this offense[.]" (Hastings's own psychiatrist stated that Hastings had been planning the homicides two years before they took place. Hastings had moved to McCarthy in the summer of 1982. The crime took place in 1983.) Salemi noted that just before and immediately after the criminal acts took place Hastings was not acting bizarre or violent and had a firm grasp of reality.

According to Salemi's affidavit, "Hastings always described his criminal acts as an outgrowth of the meaninglessness of life, the non-contingent nature of human life, and his need to both do away with his own life, and at the same time make a statement/difference." Salemi recalled that:

> Mr. Hastings never exhibited bizarre behavior, or even bizarre thinking, other than the thinking that was associated with and used to explain his grand scheme to kill the entire population of McCarthy, blow up the Trans-Alaska pipeline, and kill himself in the process. Put another way, when discussing legal issues as attorney to client, Mr. Hastings was rational, logical and even reasonable in his approach. Similarly, when engaged in general conversation with Mr. Hastings, he was always socially appropriate, reality-based, and rational. If he were suffering from some form of heavy metal toxicity it seems it would have been exhibited in his thinking or behavior during

– 5 –                                    4946

> our first meetings (which occurred within a couple of days of
> the criminal conduct in McCarthy).

While Salemi could not recall the specific details concerning the efforts to establish a link between Hastings's criminal conduct and heavy metal toxicity, he did have Hastings's hair tested, and these test results, along with "virtually everything concerning the case," were provided to the psychiatrists. Salemi did remember that Hastings's "planning of the McCarthy events predated his exposure to the lead dust, copper, etc." Salemi stated that he and the team of forensic psychologists "could find nothing upon which to support a legal or factual defense." Salemi explained that he could not "recall specific conversations with Mr. Hastings that may have occurred concerning a continuance of the trial," but he did "recall that Mr. Hastings was very concerned about a woman friend down in the Bay Area ... who had been subpoenaed to testify ... . Hastings's concern was so great that he indicated he would waive his right to a trial if that's what it would take to prevent the State from bringing this witness to Alaska."

Hastings also supplemented his application for post-conviction relief with the affidavits from himself, and two psychiatric experts, Dr. Robert Thatcher, a professor at the Applied Neuroscience Laboratories at the University of Maryland School of Medicine, and Dr. Alexander Schauss, the director of the American Institute for Biosocial Research, Inc. Dr. Thatcher stated, "If it had been possible to extrapolate higher copper levels in Mr. Hastings at the time of his crimes, scientifically, this would have strengthened a conclusion that his behavior was affected by copper toxicity." Dr. Schauss stated that based on the higher than normal levels of copper in Hastings's body, "[I]t was my opinion that there were reasonable ground[s] to develop several defenses for [Hastings]." Hastings affied that beginning in 1982 he had been exposed to copper from a preservative put on the logs in his cabin, and from drinking water from streams in Kennicott that were near extensive copper mining operations. Hastings stated that had he known that experts

– 6 –                                      4946

might have been able to use the current elevated levels of copper in his body to extrapolate the levels in his body when he committed the homicides, and further had he known that expert analysis might have led to a possible defense, he would not have entered a plea of no contest.

After numerous procedural delays, Judge Bolger ruled on Hastings's application for post-conviction relief. Judge Bolger concluded that Hastings's application had adequately alleged that the information Salemi disregarded about the metal-psychosis defense could have affected Hastings's decision to plead no contest. But, Judge Bolger also concluded that Hastings failed "to allege facts ruling out the possibility that Salemi made a sound tactical choice when he abandoned the metal-psychosis defense." Consequently, Judge Bolger dismissed Hastings's application because Hastings failed to set forth a prima facie case for relief.

### Judge Bolger did not err in dismissing Hastings's application for failure to state a prima facie case

In order to establish ineffective assistance of counsel, the defendant must show that his counsel did not perform as well as a lawyer with ordinary training and skill in the criminal law.[8] The defendant must also show that he was prejudiced: he must create a reasonable doubt that the attorney's ineffectiveness hurt him.[9]

The decision about what plea to enter is one of those fundamental decisions that is ultimately up to the defendant, not to the attorney.[10] Of course the defendant is entitled to competent advice from the attorney and the attorney's failure to properly advise

---

[8] *State v. Jones*, 759 P.2d 558, 567 (Alaska App. 1988) (citation omitted).

[9] *Id.* at 567-68 (citation omitted).

[10] Alaska R. Crim. P. 11(a); American Bar Association Standards for Criminal Justice, § 4-5.2(a)(i) (3d ed. 1993).

– 7 –                                                              4946

a client about the potential viability of a defense may amount to ineffective assistance of counsel which would authorize the defendant to withdraw his plea.[11] But to establish ineffective assistance of counsel, where the attorney makes a tactical decision, the defendant must overcome the presumption of competence and show that no effective counsel would have provided him with similar advice.[12]

Our review of Hastings's application shows that he failed to plead a prima facie case of ineffective assistance of counsel. The record shows that the attorney investigated the possibility of proceeding with a copper toxicity defense. However, the attorney alleged that he did not do further investigation and abandoned the defense because it did not fit the facts of the case. Salemi pointed out that a major problem with the defense was that Hastings had been planning the homicides long before he was exposed to the copper. Thus, Salemi made a tactical decision and Hastings had the duty to overcome the presumption that Salemi acted competently — that no effective attorney would have proceeded as Salemi did. Hastings did not allege any basis for finding that Salemi's tactical decisions were unreasonable. Therefore, Hastings did not set out a prima facie case because he failed to demonstrate that his attorney's performance was deficient.[13]

---

[11]  *Hansen v. State*, 824 P.2d 1384, 1386-90 (Alaska App. 1992).

[12]  *Jones*, 759 P.2d at 569.

[13]  *Accord Panuccio v. Kelly*, 927 F.2d 106, 108-11 (2d Cir. 1991) (attorney not ineffective by failing to inform client of possible intoxication defense to charge of first-degree manslaughter because defense was unlikely to succeed); *Wojtowicz v. United States*, 550 F.2d 786, 792-93 (2d Cir. 1977) (attorney's decision to abandon insanity defense was within range of competence of other attorneys and was not ineffective despite possible defense of insanity); *Cheely v. United States*, 535 F.2d 934, 935-36 (5th Cir. 1976) (attorney's failure to inform client of an allegedly available insanity defense was not ineffective representation because the attorney had reviewed the psychiatric report and had reasonably concluded that there was no basis for an insanity defense).

Hastings makes numerous arguments that Judge Bolger erred in not allowing the case to go forward with discovery and hearings, and instead ruling on the State's motion to dismiss on the ground that Hastings's application was deficient for failing to state a prima facie claim for relief. But the Alaska Supreme Court expressly directed Judge Bolger to evaluate the application on its face to determine whether Hastings had established a prima facie case before allowing the case to proceed with discovery.[14] Therefore, Judge Bolger did not err in following the supreme court directive to determine whether Hastings had established a prima facie case.

*Conclusion*

We conclude that Judge Bolger did not err in concluding that Hastings's application did not establish a prima facie case for relief. Therefore, Judge Bolger did not err in dismissing Hastings's application.

AFFIRMED.

---

[14]  *State v. Hastings*, Case No. S-10740 (Alaska Supreme Court Order, November 22, 2002).

– 9 –

4946